+UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CHARLES GRAY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:19-cv-01880-TWP-TAB |
| ) | |
| WEXFORD OF INDIANA, LLC, ) | |
| PAUL TALBOT and MICHELLE LAFLOWER, ) | |
| ) | |
| Defendants. ) | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed by Defendants Wexford of Indiana, LLC ("Wexford"), Paul Talbot ("Dr. Talbot") and Michelle LaFlower ("Nurse LaFlower") (collectively, "Defendants"). (Dkt. 51.) Plaintiff Charles Gray, ("Mr. Gray"), an inmate at Pendleton Correctional Facility ("Pendleton"), initiated this lawsuit alleging the Defendants were deliberately indifferent to his serious medical needs. For the following reasons, the Defendants' Motion for Summary Judgment is **granted** as to Nurse LaFlower and Wexford, and **denied** as to Dr. Talbot.

### I. SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Federal Rule of Civil Procedure 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or

presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941–42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

On summary judgment, a party must show the court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez,* 761 F.3d 822, 827 (7th Cir. 2014). The court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion. *Grant v. Trustees of Ind. Univ.,* 870 F.3d 562, 573-74 (7th Cir. 2017). Any

doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson*, 477 U.S. at 255.

## II. STATEMENT OF FACTS

The following statement of facts has been evaluated pursuant to the standards set forth above. The facts are considered to be undisputed except to the extent that disputes are noted.

### A. The Defendants

There are three Defendants: Nurse Michelle LaFlower; Dr. Paul Talbot; and Wexford of Indiana, LLC. Wexford has provided healthcare for inmates at the Indiana Department of Correction ("IDOC") since 2017. From April 1, 2017 to November 30, 2019, Dr. Talbot was employed as a physician at Pendleton by Wexford. (Dkt. 53-2 at ¶ 3.) Nurse LaFlower is a licensed nurse. (Dkt. 53-1 at ¶ 1.) At all times relevant to Mr. Gray's Complaint, she was employed by Wexford as the Health Services Administrator at Pendleton. *Id.* at ¶ 2.

From July 2015 to March 31, 2017, Dr. Talbot was employed as a physician at Pendleton by Corizon, LLC, the private company that held the healthcare contract with IDOC before Wexford. *Id.* Dr. Talbot is familiar with Mr. Gray and his medical conditions because he was one of Mr. Gray's treating providers at Pendleton. *Id.* at ¶ 4.

As the Health Services Administrator, Nurse LaFlower did not see or treat Mr. Gray for any of his medical needs, nor did she have authority to order specific treatment for Mr. Gray. *Dkt.* 53-1 at ¶¶ 4, 6. She was responsible for managing Pendleton's overall health care delivery system and monitoring all health service contract activities. *Id.* at ¶¶ 4, 6. She consulted with the Regional Manager regarding routine administrative issues and discussed complex or unusual clinical issues involving patient management with clinical leadership. *Id.* at ¶ 4

### 1.    Medical Treatment for Mr. Gray's GERD

Gastroesophageal reflux disease ("GERD") is a condition where acid from the stomach backs up into the esophagus. (Dkt. 53-2 at ¶ 6.) This can cause a burning sensation in the chest and throat. *Id.* Frequent burping, coughing, nausea, and even vomiting are associated symptoms of GERD. *Id.*

Histamine-2 blockers ("H2s") are drugs that reduce the amount of gastric acid produced by the stomach. *Id.* at ¶ 7. H2s are often used in the management of GERD. *Id.* Ranitidine, the generic form of Zantac, and famotidine, the generic form of Pepcid, are both H2s. *Id.* Zantac and Pepcid are different drugs chemically, but they both operate to reduce stomach acid. *Id.* According to Dr. Talbot, neither drug is better than the other, and Pepcid is an equivalent therapeutic alternative[1] to Zantac. *Id.*

Mr. Gray was diagnosed with GERD and a hiatal hernia at the IDOC in 1990. (Dkt. 53-4 at 17; Dkt. 53-3 at 1.) Mr. Gray does not know what symptoms are attributable to GERD versus his hiatal hernia, but the parties do not dispute that he has GERD. (Dkt. 53-4 at 17; Dkt. 53-2 at ¶ 9.) Mr. Gray's symptoms, including a burning sensation in his throat and occasional vomiting, mainly occur when he lies down at night. (Dkt. 53-2 at ¶ 12; Dkt. 53-4 at 12, 17.) Mr. Gray avoids eating after 6:00 p.m. and tries not to eat foods that aggravate his symptoms, such as spicy food and coffee. (Dkt. 53-4 at 7, 16.) He also attempts to sleep in an elevated position, but this is difficult because he is not allowed an extra pillow and must use his blanket or towels which often shift as he sleeps. (Dkt. 53-4 at 6, 7.) Mr. Gray has never seen an outside specialist for advanced testing and

---

[1] Dr. Talbot does not define "therapeutic equivalence." The Federal Drug Administration states that drugs are therapeutically equivalent when one drug "can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed drug." FDA, "Drugs@FDA Glossary of Terms," https://www.fda.gov/drugs/drug-approvals-and-databases/drugsfda-glossary-terms#TE (last updated Nov. 14, 2017). Furthermore, drugs are considered therapeutically equivalent only if they are pharmaceutical equivalents, *i.e.* they "contain the same active ingredient(s); dosage form and route of administration; and strength." *Id.* As Dr. Talbot acknowledges, Zantac and Pepcid have different active ingredients.

is concerned that his GERD may have evolved into cancer. *Id.* at 7.

Until the fall of 2017, Mr. Gray had been prescribed Zantac for over twenty years at the IDOC. (Dkt. 76 at 22.) For a period of time, he was being provided Prilosec, a proton-pump inhibitor, along with Zantac to treat his GERD. (Dkt. 76 at 19–20.) When he was on both medications, he did not experience GERD symptoms often. (Dkt. 53-4 at 12.) Mr. Gray was taken off Prilosec and continued taking Zantac. *Id.* Zantac alleviated his symptoms. *Id.*

In the fall of 2017, the pharmacy removed Zantac from the formulary and added Pepcid for the treatment of GERD symptoms. (Dkt. 53-2 at ¶ 8.) Thereafter, Dr. Talbot prescribed Pepcid for Mr. Gray's GERD. *Id.*

However, that Pepcid—at least with a 20-milligram dosage—did not help control Mr. Gray's GERD symptoms at all. (Dkt. 53-4 at 12.) On November 13, 2017, he submitted a "request for interview" to Nurse LaFlower requesting to be put back on Zantac, noting that he had been on Zantac for over twenty years and the newly prescribed Pepcid "DOES NOT WORK." (Dkt. 76 at 22.) Nurse LaFlower responded, "Pepcid is a therapeutic equivalent to Zantac, which is why you have received Pepcid. A request has been sent to pharmacy to send Zantac instead of Pepcid." *Id.* Mr. Gray acknowledged that Nurse LaFlower responded to his inquiry. (Dkt. 53-4 at 10.) He is suing her because her name came up in the grievance process. *Id.* at 10.

Mr. Gray submitted healthcare requests twice in November and once in December 2017, stating that the Pepcid was not helping his GERD. His medical records reflect that he had an active order for Pepcid from November 27, 2017 through November 16, 2018. (Dkt. 53-3 at 11.)

After switching from Zantac to Pepcid, Mr. Gray saw Dr. Talbot for chronic care visits where they discussed his GERD. (Dkt. 53-3 at 5, 16.) On February 8, 2018, Dr. Talbot recorded in his treatment notes that Mr. Gray's GERD symptoms were relieved with Pepcid. As Mr. Gray

5

proceeded through the grievance process to contest the switch from Zantac to Pepcid, Nurse LaFlower relied on Dr. Talbot's notes from that visit to conclude that Zantac was not necessary. (Dkt. 76 at 51.)

On May 21, 2018, Dr. Talbot recorded in his notes that Mr. Gray's GERD was "resolved." (Dkt. 53-3 at 5.) On November 15, 2018, Mr. Gray was seen by Nurse Practitioner Elaine Perdue, who prescribed him Zantac from November 15, 2018 to May 14, 2019. *Id.* at 4. On May 1, 2019, Dr. Talbot's final appointment with Mr. Gray, he recorded that Mr. Gray's GERD was "improving" and he gets relief with H2s. (Dkt. 53-3 at 16.) Dr. Talbot ordered Pepcid for Mr. Gray to last through October 27, 2019. Thus, based on his review of Mr. Gray's medical records, Dr. Talbot believed Mr. Gray's GERD remained stable while on Zantac and on Pepcid, and his symptoms were not objectively different while taking Pepcid versus Zantac. (Dkt. 53-2 at ¶ 12.) In Dr. Talbot's opinion, there was no clinical reason to switch Mr. Gray back to Zantac. *Id*. at ¶ 8.

According to Dr. Talbot, if Mr. Gray had exhibited symptoms that showed that Pepcid did not control his symptoms as well as Zantac, he would have discussed with him potential other factors, such as Mr. Gray's commissary purchases or timing of symptoms, that may have been the cause. *Id.* at ¶ 13. If needed, Dr. Talbot could have requested Zantac through a non-formulary request. *Id*. However, by 2019, questions had arisen regarding the long-term efficacy and risks associated with Zantac, and therefore, Dr. Talbot most likely would have tried to find an alternative way to address Mr. Gray's symptoms, other than prescribing Zantac. *Id*. Further, the evolving standard of care for treatment of GERD has moved away from the chronic or long-term prescription of H2 blockers or proton pump inhibitors because new medical research has demonstrated that long-term use of these medications—especially in lieu of lifestyle changes—can lead to the development of permanent esophageal scarring or other side effects. *Id*. at ¶ 10.

As such, it is in the patient's best interest to find ways to manage their heartburn in the absence of these medications to avoid the potential side effects of long-term use. *Id.* at ¶ 10. To that end, Dr. Talbot also educated Mr. Gray to refrain from provocative foods, to not lie down three to four hours after eating, and to elevate his head while sleeping. *Id.* ¶ 12. Despite concerns about long-term medication use, given Mr. Gray's reported symptoms, Dr. Talbot continued to prescribe H2 blocker medications to be taken as needed. *Id.* at ¶ 11.

Dr. Talbot does not recall Mr. Gray ever requesting a special diet due to his symptoms, and his medical records do not show him ever making such a request. *Id.* at ¶ 14. Dr. Talbot reviewed Mr. Gray's commissary purchases which indicated that he had been purchasing and consuming numerous food items that can exasperate or inflame his GERD symptoms. *Id.* at ¶ 9. Dr. Talbot counseled Mr. Gray numerous times regarding these purchases.[2] *Id.* Dr. Talbot believes a special diet would not have been approved due to Mr. Gray's commissary purchases, and that any benefit from a special diet would have been undone by Mr. Gray eating food he purchased from commissary. *Id.* at ¶ 14.

Mr. Gray disputes that Dr. Talbot's notes from the chronic care visits accurately reflect the visits, alleging that Dr. Talbot "falsified most of those records to make it look like he's doing his job and there's no problems with me when that couldn't be furthest from the truth." During chronic care visits with Dr. Talbot, Mr. Gray felt "like I didn't exist," and Dr. Talbot would "sit there and type on the computer," not paying attention to Mr. Gray's concerns. (Dkt. 53-4 at 8.) Mr. Gray raised his dissatisfaction with Pepcid every time he saw Dr. Talbot and asked him to change the medication or increase the dosage, but his request "went in one ear and out the other." *Id.* at 15-16.

---

[2] Mr. Gray's commissary purchases are not in the record, and it is not clear when Dr. Talbot reviewed them. Also, although Mr. Gray's medical records reflect that he was repeatedly educated about avoiding certain foods, the records do not state that this education was due to his commissary purchases.

7

Mr. Gray asked Dr. Talbot about a special diet, but Dr. Talbot "didn't acknowledge" the inquiry. *Id.* at 14. Mr. Gray requested a no citrus, no tomato, no legume diet in his Complaint because he was aware that this was the type of diet another inmate with GERD was provided. *Id.* at 13-14. He does not know what food has citrus in it, or what legumes are, but included this request because another inmate helped write the Complaint. *Id.* However, Mr. Gray wants a special diet because the meals served by the prison often contain trigger foods he has been advised to avoid, such as spaghetti sauce, chili, and spicy gravies. *Id.* at 13-14. Mr. Gray admitted that he has occasionally purchased coffee on commissary, but not to drink.[3] *Id.* at 16.

Zantac was available for inmates to purchase from commissary, but Mr. Gray testified that he could not afford it. *Id.* at 13. At some point after Mr. Gray's prescription was switched from Pepcid to Zantac, Mr. Gray heard news reports that Zantac was being removed from stores because it possibly caused cancer.[4] *Id.* at 13, 18. After Dr. Talbot left Pendleton, the new doctor prescribed Mr. Gray a higher dosage of Pepcid, but he had not received it at the time of his deposition. *Id.* at 19.

When asked why he was suing Wexford, Mr. Gray testified that he could not explain his claim against them, but he agreed that he wanted to hold Wexford responsible for Dr. Talbot. *Id.* at 11. When asked about the statement in his Complaint alleging that Wexford was trying to cut costs, Mr. Gray testified that while there could have been a medical reason he was switched from

---

[3] Mr. Gray implied that he bought coffee to trade with inmates saying, "Well, in this environment, food and—it's just like years ago I would buy cigarettes. I've never smoked cigarettes ever in my life but they're money in the prison. … So, yes, I do buy coffee here or there for other reasons, not necessarily to drink." (Dkt. 53-4 at 16.)

[4] The United States Food and Drug Administration issued a statement in September of 2019 stating that it "…learned that some ranitidine medicines, including some products commonly known as the brand-name drug Zantac, contain a nitrosamine impurity called N-nitrosodimethylamine (NDMA) at low levels. NDMA is classified as a probable human carcinogen (a substance that could cause cancer) based on results from laboratory tests." *See* https://www.fda.gov/news-events/press-announcements/statement-alerting-patients-and-health-care-professionals-ndma-found-samples-ranitidine (last visited February 26, 2021).

8

Zantac to Pepcid, he thinks Zantac probably costs more than Pepcid but he does not know that. *Id.* Mr. Gray included as an exhibit Wexford's cost of Omeprazole, generic for Prilosec, and Famotidine, generic for Pepcid, but not the cost of Zantac. (Dkt. 76 at 66.)

Dr. Michael Mitcheff, Wexford's Regional Medical Director, testified that Wexford has no policy whereby patients are not allowed to receive medications, such as H2 blockers, that they medically require for financial purposes. (Dkt. 66-2 at ¶¶ 2, 3.) Rather, providers determine on a case by case basis what medication is needed using their professional medical judgment. *Id.* at ¶ 3. Further, Wexford has no express policy about the treatment of GERD. *Id.* at ¶ 4.

### III. DISCUSSION

At all times relevant to Mr. Gray's claim, he was a convicted offender. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Pursuant to the Eighth Amendment, prison officials have a duty to ensure that inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk, *id.* at 837; *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014). Deliberate indifference in this context is "something akin to recklessness." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). "A delay in treating non-life-threatening but painful

9

conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Id. at* 753.

For a medical practitioner, deliberate indifference can be shown by a "treatment decision that is 'so far afield of accepted professional standards' that a jury could find it was not the product of medical judgment." *Cesal v. Moats*, 851 F.3d 714, 724 (7th Cir. 2017) (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)). The Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

No Defendant disputes for purposes of summary judgment that Mr. Gray's GERD constitutes a serious medical need. *See also Rowe v. Gibson*, 798 F.3d 622, 628 (7th Cir. 2015) (recognizing GERD as a serious medical condition). Accordingly, the Court will consider only whether the Defendants were deliberately indifferent to the treatment of Mr. Gray's GERD.

**A.    Nurse LaFlower**

Based on the undisputed facts, Nurse LaFlower was not deliberately indifferent to Mr. Gray's GERD. Mr. Gray asked Nurse LaFlower to be switched back to Zantac, and she responded that Pepcid was the therapeutic equivalent but she would request that the pharmacy send Zantac rather than Pepcid. (Dkt. 76 at 47.) Nurse LaFlower subsequently learned that because Zantac had been removed from the formulary, Dr. Talbot would need to approve it, but he decided during a provider visit that Pepcid was relieving Mr. Gray's symptoms. *Id.* at 48. Nurse LaFlower did not ignore Mr. Gray's concerns. Rather, she investigated them and relied on Dr. Talbot's treatment decision. This was a reasonable response and did not demonstrate a reckless disregard for his needs.

Further, in her role as Health Services Administrator, Nurse LaFlower did not treat inmates and had no authority to intervene in Mr. Gray's treatment plan. Accordingly, she was not deliberately indifferent to his medical needs. *See Machicote v. Roethlisberger*, 969 F.3d 822, 828 (7th Cir. 2020) (holding health services manager was not liable where she had no knowledge of inmate's treatment, no authority to intervene, and no personal involvement beyond fielding a nurse's complaint about him).

Because no reasonable factfinder could find that Nurse LaFlower acted with deliberate indifference, she is entitled to summary judgment.

**B.   Dr. Talbot**

Unlike Nurse LaFlower, Dr. Talbot was responsible for assessing Mr. Gray's GERD and determining the appropriate care for him. Dr. Talbot prescribed Mr. Gray Zantac or Pepcid to treat his symptoms and counseled him on proper diet and lifestyle modifications. Further, Mr. Gray concedes that, in light of evidence that Zantac may cause cancer, Dr. Talbot was not deliberately indifferent solely for not switching his medication back to Zantac. (Dkt. 78 at 13, ¶¶ 62, 63.) However, Mr. Gray argues that Dr. Talbot was deliberately indifferent by ignoring his complaints that Pepcid offered no relief and providing no other treatment, such as an alternative diet or a special pillow that could keep his head elevated at night. *Id.* at 13, 14, ¶ 64, 66.

There are material disputed issues of fact with respect to the adequacy of care Dr. Talbot provided Mr. Gray to treat his GERD after Mr. Gray's prescription was switched from Zantac to Pepcid. Dr. Talbot testified that Pepcid and Zantac worked in the same manner to reduce stomach acid and that one was not better than the other. But Mr. Gray asserts that Zantac helped his symptoms and Pepcid did not. "[D]eliberate indifference claims based on medical treatment require reference to the *particularized circumstances* of individual inmates." *Roe v. Elyea*, 631

11

F.3d 843, 859 (7th Cir. 2011). "[I]t is implicit in the professional judgment standard itself, …, that inmate medical care decisions must be fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm and the efficacy of available treatments." *Id*. Tellingly, Dr. Talbot's treatment notes indicate that Mr. Gray's GERD improved (Dkt. 53-3 at 16) after a nurse practitioner switched Mr. Gray from Pepcid back to Zantac for several months. *See also*, *Rowe*, 798 F.3d at 627–28 (holding that plaintiff produced evidence of deliberate indifference where medical providers failed to provide free Zantac for a month and insisted that plaintiff take Zantac at certain times of day rather than with meals).

Further, Mr. Gray also alleges that he consistently told Dr. Talbot at the chronic care visits that Pepcid was ineffective, but Dr. Talbot ignored him. The Seventh Circuit has held that one clear demonstration of deliberate indifference is "where a prison official persists in a course of treatment known to be ineffective." *Petties v. Carter,* 836 F.3d 722, 729–30 (7th Cir. 2016); *see also Arnett,* 658 F.3d at 754 ("A prison physician cannot simply continue with a course of treatment that he knows is ineffective in treating the inmate's condition."); *Greeno v. Daley,* 414 F.3d 645, 655 (7th Cir. 2005) (continuing to treat severe vomiting with antacids and refusing to refer inmate to a specialist over three years created material fact issue of deliberate indifference).

There is also a question of fact regarding whether Mr. Gray should have been provided a special diet. He alleges that he asked Dr. Talbot to be placed on a special diet but was again ignored. Although Dr. Talbot believes that a special diet would not have been approved because of Mr. Gray's commissary purchases, Mr. Gray's commissary purchases are not in the record. The Court does not know what he bought, in what quantity, or when; Mr. Gray only admitted to buying coffee on occasion. And because Dr. Talbot acknowledged that the standard of care is shifting away from constant use of medications like Pepcid to lifestyle modifications in light of risks from

12

long-term medication use, a jury could find that not attempting to place Mr. Gray on a special diet demonstrated deliberate indifference.

Accordingly, the Defendants' Motion for Summary Judgment is **denied** as to Dr. Talbot.

## C.  Wexford

Because Wexford acts under color of state law by contracting to perform a government function, *i.e.* providing medical care to correctional facilities, it is treated as a government entity for purposes of Section 1983 claims. *See Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 fn.6 (7th Cir. 2002). As such, Wexford "cannot be held liable for damages under 42 U.S.C. § 1983 on a theory of *respondeat superior* for constitutional violations committed by their employees. They can, however, be held liable for unconstitutional … policies or customs." *Simpson v. Brown County*, 860 F.3d 1001, 1005–06 (7th Cir. 2017) (citing *Monell v. Dep't of Social Services*, 436 U.S. 658, 690–91 (1978)).

Therefore, to prove a deliberate indifference claim against Wexford, Mr. Gray must establish that he suffered a constitutional deprivation as the result of an express policy or custom of Wexford. Mr. Gray must show that Wexford has: (1) an express policy that, when enforced, caused a constitutional deprivation; (2) a practice that is so widespread that, although not authorized by written or express policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policy making authority. *Estate of Moreland v. Dieter*, 395 F.3d 747, 758–759 (7th Cir. 2004); *see also Teesdale v. City of Chi.*, 690 F.3d 829, 833–34 (7th Cir. 2012) (noting policy or custom must be the "moving force" behind the deprivation of constitutional rights).

There is no evidence to support a conclusion that a Wexford policy caused Mr. Gray's GERD symptoms to go unaddressed. Wexford has no specific policy about the treatment of

GERD, nor is there evidence that they had a policy advising providers to choose some medications over others due to cost. As mentioned above, a jury might conclude that Dr. Talbot was deliberately indifferent to Mr. Gray's complaints about his symptoms. But that problem is attributable to his actions rather than Wexford policy, and Wexford cannot be held liable for a provider's actions in the absence of a policy or practice. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014) (*Respondeat superior* is not a viable basis for a 42 U.S.C. § 1983 claim against a corporation.).

Mr. Gray has not provided evidence that a Wexford policy or practice resulted in inadequate treatment of his GERD. Accordingly, Wexford is entitled to summary judgment on Mr. Gray's policy and practice claim.

## IV.  CONCLUSION

The Defendants' Motion for Summary Judgment, (Dkt. [51]), is **GRANTED in part and DENIED in part.** It is **granted** as to claims against Nurse LaFlower and Wexford and **denied** as to claims against Dr. Talbot. Mr. Gray's claims against Nurse LaFlower and Wexford are **dismissed with prejudice**, and the **Clerk is directed** to terminate them as defendants on the docket.

Because there are material issues of fact regarding Dr. Talbot's care of Mr. Gray, the Eighth Amendment claims against him shall proceed to settlement or trial. No partial final judgment shall issue at this time.

The Court prefers that Mr. Gray be represented by counsel at a settlement conference and trial if one is necessary. The Court has prepared a form motion to be used by indigent litigants seeking the appointment of counsel. The form requests the information necessary for the Court to determine the merits of the motion, and it requires the litigant to acknowledge important conditions

14

of the appointment of counsel.  Mr. Gray shall have **through Wednesday, March 31, 2021**, by which to either return a completed motion for counsel form to the Court or object to the recruitment of counsel on his behalf.  **The Clerk is directed** to include a copy of the motion for counsel form with Mr. Gray's copy of this Order.

    **SO ORDERED.**

Date:  3/2/2021

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Charles Gray, #900702
PENDLETON CORRECTIONAL FACILITY
Inmate Mail/Parcels
4490 West Reformatory Road
Pendleton, Indiana  46064

Douglass R. Bitner
KATZ  KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com